**LEWIS, Exr., Appellant,**

v.

**OHIO DEPARTMENT OF HUMAN SERVICES, Appellee.**

[Cite as *Lewis v. Ohio Dept. of Human Serv.* (2000), 137 Ohio App.3d 458.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 98–L–240.

Decided April 3, 2000.

*Smith & Condeni Co., L.P.A.,* and *Brian R. Hassett; Douglas W. Arthur,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Patrick W. Beatty,* Assistant Attorney General, for appellee.

CHRISTLEY, Judge.

This is an accelerated appeal taken from a final judgment of the Lake County Court of Common Pleas. Appellant, Ann Lewis, executrix of the estate of William W. Lewis, appeals from the judgment of the common pleas court upholding the decision of appellee, the Ohio Department of Human Services, to deny the May 2, 1997 Medicaid application filed by the decedent.

William W. Lewis ("Lewis") began to reside in St. Augustine Manor Nursing Home in Cleveland, Ohio, on October 1, 1995. This date represented the first continuous period of institutionalization of Lewis as the institutionalized spouse. Appellant, his wife, continued to live on her own as the community spouse. In the nursing facility, Lewis was able to receive skilled care, which included the use of a ventilator and attendance by respiratory therapists.

For purposes of Medicaid eligibility, the couple's total countable resources at the time of Lewis's institutionalization were $304,798. As the community spouse, appellant's spousal share was $152,399, or one-half of the total countable resources.

On May 2, 1997, Lewis applied for Medicaid benefits through the Cuyahoga County Department of Human Services ("CCDHS"). During the interval between Lewis's initial institutionalization and the filing of the Medicaid application, the couple had expended a portion of their assets such that their total countable resources on May 2, 1997, was determined to be $172,455. In order to ascertain Lewis's eligibility for Medicaid benefits, CCDHS calculated appellant's community spouse resource allowance ("CSRA") to be $79,020. The CSRA represented the maximum amount that could be transferred to appellant as the community spouse from the joint spousal resources. When the CSRA was deducted from the total countable resources, $93,435 in resources remained attributable to Lewis.

Under Ohio law, the Medicaid resource limitation for an individual is $1,500. Since Lewis's assets of $93,435 were well above $1,500, CCDHS determined that he had excess countable resources and was, therefore, not eligible for Medicaid

benefits. Notice of the CCDHS decision was mailed to the couple on December 10, 1997.

In arriving at its decision, CCDHS had calculated that appellant was entitled to a minimum monthly maintenance needs allowance ("MMMNA") of $1,724. Since appellant had gross countable monthly income of only $519, CCDHS determined that she should receive a monthly income allowance ("MIA") of $1,205 in order to meet the MMMNA.

Pursuant to R.C. 5101.35(B), Lewis requested a state hearing on the denial of his Medicaid application by CCDHS. The state hearing was held on March 24, 1998. In this proceeding, Lewis sought a recalculation of the $79,020 CSRA on the ground that appellant's monthly income, coupled with the income generated by the CSRA, was inadequate to raise appellant's income to the level of the MMMNA. Lewis asked that the CSRA be increased by transferring to appellant a portion of the total countable resources previously attributed to him as the institutionalized spouse. This would leave appellant, as the community spouse, with greater resources by which to generate sufficient income to meet the MIA of $1,205.

Upon reviewing the financial data, the state hearing officer determined that a reallocation of resources was warranted. Lewis had provided three estimates demonstrating that $124,314 was the average cost of a single premium lifetime immediate monthly payment annuity which would produce monthly payments of $1,205. Consequently, the state hearing officer transferred $45,294 in resources from Lewis to appellant. When added to the original CSRA of $79,020, the adjusted CSRA after the reallocation of resources was $124,314.

When $45,294 was deducted from Lewis's original total countable resources of $93,435, however, he was left with $48,141. This still exceeded the $1,500 resource limitation for Medicaid applicants as provided for by Ohio law.

During the course of the state hearing, Lewis's counsel maintained that St. Augustine did not properly bill Lewis for services rendered after he began to reside in the nursing facility in October 1995. Apparently, the nursing home was experiencing difficulty with its accounting procedures during this time period. As a result, while Lewis was accruing expenses at St. Augustine, he claimed to be unable to pay the costs associated with his care in a timely fashion (*i.e.*, contemporaneously with the rendering of the services). Thus, Lewis's counsel asserted that the couple was not able to spend down its countable resources prior to filing the Medicaid application on May 2, 1997.[1]

---

1. There was no suggestion, however, that Lewis was prevented from paying St. Augustine a sum of money at regular intervals based on an approximate estimation of the costs associated with his care.

It was uncontroverted that St. Augustine finally submitted proper bills to Lewis in January 1998, which resulted in payments totaling $52,000 to the nursing home in February and March 1998. Lewis's counsel argued that these expenditures should be subtracted from the $48,141 in resources still attributed to Lewis after the adjustment to the CSRA.

In essence, counsel was requesting that Lewis's total countable resources as of May 2, 1997, be reduced by the payments made to St. Augustine in February and March 1998 because these payments were made in satisfaction of nursing home debts that were incurred prior to the filing of the Medicaid application. If this were done, then Lewis presumably would have been eligible for Medicaid benefits retroactive to May 2, 1997, because his total countable resources at that time would have been less than the resource limitation of $1,500.

In a written decision rendered on March 26, 1998, the state hearing officer concluded that there was no provision for reducing an institutionalized spouse's resources by an amount of expenditures that were made after the Medicaid application was submitted, regardless of when or how the expenses were actually incurred. Instead, the pertinent date for resource determination is the date of the Medicaid application. In Lewis's case, although an unbilled liability to St. Augustine for services rendered may have existed as of May 2, 1997, the uncontroverted findings of fact demonstrated that Lewis's resources were not applied toward that liability until almost ten months after the Medicaid application was filed. In other words, Lewis's resources were not encumbered by a legally binding debt to the nursing home at the time of the Medicaid application. As such, the state hearing officer determined that CCDHS correctly denied the May 2, 1997 application for Medicaid benefits due to Lewis's excess resources.

Pursuant to R.C. 5101.35(C), Lewis appealed the state hearing decision to the Director of the Ohio Department of Human Services ("ODHS"). On April 21, 1998, the designee of the Director of ODHS issued an administrative appeal decision affirming the state hearing decision to the effect that CCDHS properly denied Lewis's Medicaid application on the basis that his assets exceeded the $1,500 resource limitation.

The issue before ODHS was again whether the unbilled debt owed to St. Augustine at the time of the May 2, 1997 Medicaid application constituted an "encumbrance" because it restricted Lewis from using those funds for his support and maintenance. In its administrative appeal decision, ODHS noted that the issue was not Lewis's current potential eligibility for Medicaid benefits but rather whether CCDHS was correct in denying him such benefits as of the May 2, 1997 application date. ODHS effectively concluded that Lewis's access to his resources was not encumbered when he applied for Medicaid because no legal liability existed until St. Augustine billed him in January 1998. Moreover, the

resources were not spent down until Lewis paid $52,000 to the nursing home in February and March 1998. As such, ODHS determined that the state hearing decision was neither contrary to the evidence presented at the state hearing nor predicated upon a misapplication of a statute or an administrative regulation.

Subsequently, on May 18, 1998, Lewis invoked his right under R.C. 5101.35(E) to appeal the decision of ODHS by filing a notice of appeal in the Lake County Court of Common Pleas. The notice of appeal was filed in Lake County because Lewis was transferred from St. Augustine to a health care facility in Kirtland, Ohio, following the administrative appeal decision.

Lewis thereafter died on May 31, 1998. Upon motion of counsel, the common pleas court substituted appellant for Lewis due to her status as the executor of his estate.[2] On October 6, 1998, the common pleas court issued its judgment affirming the administrative decision of ODHS. In doing so, the common pleas court concluded that "[a] plain reading of O.A.C. 5101:1–39–05(A)(1) and (A)(7) demonstrates that the existence of Mr. Lewis' debt to St. Augustine Manor at the time of his application and payments made after the application cannot be used to offset the amount of his resources."

From this judgment, appellant filed a timely notice of appeal with this court. She now asserts the following assignment of error:

"The trial court and the administrative agencies erred in denying Medicaid benefits to the Appellant."

In her lone assigned error, appellant posits that the common pleas court erred in affirming the decisions of ODHS, the state hearing officer, and CCDHS which denied Lewis's May 2, 1997 application for Medicaid benefits. As will be explained forthwith, appellant's argument is not well founded.

The instant appeal was instituted pursuant to R.C. 5101.35(E). This statute provides:

"(E) An appellant who disagrees with an administrative appeal decision of the director of job and family services or the director's designee issued under division (C) of this section may appeal from the decision to the court of common pleas pursuant to section 119.12 of the Revised Code."

Thus, an appeal taken from a decision of ODHS is governed by the provisions of the Administrative Procedure Act as codified in R.C. 119.12. This statute sets forth a specific standard of review to be applied in R.C. 119.12

---

**2.** The executor of a deceased Medicaid applicant "stands in the shoes" of the decedent. *Dawson v. Ohio Dept. of Human Serv.* (1990), 68 Ohio App.3d 262, 263–264, 588 N.E.2d 217, 218–219, Thus, the appeal of a denial of Medicaid benefits continues after the death of the applicant where a qualified executor pursues such appeal. *Id.* at 264, 588 N.E.2d at 219,

administrative appeals, to wit, a common pleas court must affirm the decision of the administrative agency when that decision is supported by reliable, probative, and substantial evidence and is in accordance with law. R.C. 119.12. See, also, *Kennedy v. Marion Correctional Inst.* (1994), 69 Ohio St.3d 20, 21, 630 N.E.2d 324, 325–326; *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 110, 17 O.O.3d 65, 66–67, 407 N.E.2d 1265, 1267; *Collett v. Dept. of Hwy. Safety* (Sept. 30, 1997), Trumbull App. No. 96–T–5543, unreported, at 2, 1997 WL 663526.

The Supreme Court of Ohio has defined the quality of evidence required by R.C. 119.12 to sustain an administrative decision:

"(1) 'Reliable' evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) 'Probative' evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) 'Substantial' evidence is evidence with some weight; it must have importance and value." (Footnotes omitted.) *Our Place, Inc. v. Ohio Liquor Control Comm.* (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303, 1305,

█ Although the common pleas court must give due deference to the administrative resolution of the matter, the agency's findings are not conclusive. *Conrad*, 63 Ohio St.2d at 111, 17 O.O.3d at 67, 407 N.E.2d at 1267–1268, The common pleas court may engage in a limited weighing of the evidence and may evaluate the credibility of witnesses when determining whether an administrative decision was supported by reliable, probative, and substantial evidence. Absent a finding that the agency's decision was supported by such evidence, the court may substitute its judgment for that of the agency by reversing, vacating, or modifying the administrative order. R.C. 119.12.

█ The standard of review to be applied by a court of appeals is whether the decision of the common pleas court constituted an abuse of discretion. *Am. Legion Post 0046 Bellevue v. Ohio Liquor Control Comm.* (1996), 111 Ohio App.3d 795, 799, 677 N.E.2d 384, 386–387; *Hawkins v. Marion Correctional Inst.* (1990), 62 Ohio App.3d 863, 870, 577 N.E.2d 720, 724–725. Thus, in reviewing an order of the common pleas court which determined an appeal from an administrative agency, the court of appeals may not substitute its judgment for that of the agency or the common pleas court. Rather, the appellate court's scope of review is limited to the abuse-of-discretion standard. *Collett*, unreported, 1997 WL 663526, at 2.

█ With regard to questions of law, however, the court of appeals exercises a plenary power of review. See, *e.g.*, *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 339, 343–344, 587 N.E.2d 835, 838–839. When issues of law are involved, an appellate court " 'must

make its own independent determination of the law to be applied to the facts found by the agency and held by the common pleas court to be supported by reliable, probative and substantial evidence.' " *Hurt v. Ohio Liquor Control Comm.* (Nov. 26, 1997), Montgomery App. No. 16232, unreported, at 5, 1997 WL 736506, quoting *Franklin Cty. Bd. of Commrs. v. State Emp. Relations Bd.* (1993), 92 Ohio App.3d 585, 588, 636 N.E.2d 407, 409,

In the case *sub judice,* the common pleas court determined that the decision of ODHS to affirm the denial of Lewis's Medicaid application was supported by reliable, probative, and substantial evidence. Upon review, it is obvious that the common pleas court's judgment in this regard did not constitute an abuse of discretion.

Indeed, there really was no evidentiary conflict whatsoever in the instant matter. Starting with Lewis's initial institutionalization in St. Augustine through the payment of the $52,000 to the nursing home in February and March 1998, the factual underpinnings were essentially uncontroverted.

Instead, the administrative appeal was instituted by Lewis based solely upon the ground that CCDHS misapplied the relevant regulations governing Medicaid eligibility. ODHS determined that Lewis had total countable resources in excess of the $1,500 resource limitation at the time of the May 2, 1997 application, notwithstanding the fact that Lewis subsequently paid $52,000 to St. Augustine in early 1998 for past expenses incurred. On appeal, the common pleas court agreed with the reasoning of ODHS by concluding that Lewis was not precluded from using the $48,141 in resources that remained attributable to him for his support and maintenance. As such, his assets clearly exceeded the $1,500 resource limitation for purposes of Medicaid eligibility.

On appeal to this court, appellant offers only one substantive legal argument as to why the administrative decision was allegedly in error and why, therefore, the common pleas court's affirmance of that decision was purportedly an abuse of discretion, to wit, whether the governing administrative regulations allow for the reduction of the total countable resources attributable to Lewis by the amount paid to St. Augustine subsequent to the filing of the Medicaid application on May 2, 1997, under a theory that such expenditures were made in satisfaction of a previously undetermined and unbilled debt incurred as a result of services rendered at the nursing home prior to the application date?

Despite the seemingly inequitable result, this court concludes that the pertinent administrative regulations dictate that the answer to the question presented is "no." These regulations require the decision rendered by ODHS and subsequently affirmed by the common pleas court.

■ Under relevant federal law, the attribution of resources to the institutionalized spouse takes place at the time of the initial Medicaid eligibility determination (*i.e.,* at the time of the application for benefits). See Section 1396r–5(f)(2), Title 42, U.S.Code. See, also, *Martin v. Ohio Dept. of Human Serv.* (1997), 122 Ohio App.3d 679, 681, 702 N.E.2d 915, 916–917 (holding that the resources of a Medicaid applicant which are considered in determining the applicant's eligibility for benefits are those available to him when the application is filed). In the case at bar, Lewis applied for Medicaid benefits on May 2, 1997; ergo, CCDHS was obligated to assess Lewis's total countable resources as of that date.

Initially, CCDHS determined that Lewis had $93,435 in resources available to him based on appellant's CSRA of $79,020. After that decision was appealed, the state hearing officer agreed that an upward adjustment of the CSRA to $124,314 was warranted. The increase in the CSRA was accomplished by transferring an additional $45,294 in resources from Lewis to appellant, thereby leaving Lewis with total countable resources of $48,141. This amount obviously was still in excess of the $1,500 resource limitation for Medicaid applicants in Ohio.

Chapter 5101:1–39 of the Ohio Administrative Code sets forth the governing Medicaid eligibility requirements in this state. Specifically, Ohio Adm.Code 5101:1–39–05 provides the definitions that are germane to the resource attribution question raised by the instant appeal. It reads:

"(A) There are certain restrictions of value placed upon an applicant/recipient's resources in medicaid. There is an overall maximum placed upon total nonexempt resources, which is termed the resource limitation. * * * Not everything an individual owns is a resource and not all resources count against the resource limit. * * * Any assets that are resources but not specifically excluded are countable. Below are definitions and general principles which are used when dealing with resources.

"(1) 'Resources' are defined as cash and any other personal property, as well as any real property, that an individual and/or spouse owns, has the right, authority, or power to convert to cash (if not already cash), and is not legally restricted from using for his support and maintenance.

" * * * *

"(4) 'Countable resources' are those resources remaining after all exemptions have been applied.

"* * *

"(6) 'Equity' value is the current market value of a resource minus any encumbrance on it. The value of a resource usually is the amount of the individual's/couple's equity in it.

"(7) An 'encumbrance' is a legally binding debt against a specific property. Such a debt reduces the value of the encumbered property but does not have to prevent the property owner from transferring ownership (selling) to a third party. However, if the owner of encumbered property does sell it, the creditor will nearly always require debt satisfaction from the proceeds of sale.

"(8) The 'resource limitation' is the overall maximum value placed upon an applicant/recipient's total countable resources. For an individual, the resource limitation is one thousand five hundred dollars. * * * "

Pursuant to Ohio Adm.Code 5101:1–39–05(A)(1), "resources" are defined as cash, real property, or personal property, whether liquid or nonliquid, which the Medicaid applicant and/or his spouse is not legally restricted from using for his support and maintenance. The value of a resource generally is the amount of the individual's or couple's equity in the asset. In turn, "equity" value is the current market value of a resource minus any "encumbrance" on it. Ohio Adm.Code 5101:1–39–05(A)(6).

On appeal before this court, appellant contends that the regulations allow for the amount of resources allocated to Lewis as of the date of his application on May 2, 1997, to be reduced by the $52,000 that was paid to St. Augustine in February and March 1998, even though such expenditures were made well after the filing of the application and the concomitant attribution of resources. In support of this position, appellant essentially argues that the services rendered by the nursing home to Lewis prior to May 2, 1997, constituted a legally binding debt and, therefore, amounted to an "encumbrance" on Lewis' ability to use the $48,141 in resources for his support and maintenance.

We disagree. At the time Lewis applied for Medicaid assistance on May 2, 1997, the funds attributable to him were not encumbered by a legally binding debt owed to St. Augustine. There was certainly no encumbrance in the sense of "a legally binding debt against a specific property." This restrictive language in the Ohio Adm.Code 5101:1–39–05(A)(7) definition of an "encumbrance" encompasses liens and other legally cognizable security interests. No such encumbrance on Lewis's $48,141 in resources existed here.

Although an undetermined nursing home financial liability may have existed in theory, the uncontroverted findings of fact showed that Lewis's resources were not applied toward that liability until almost ten months after the submission of the Medicaid application. In the context of this scenario, the Ohio Administrative Code does not mandate that the institutionalized spouse's resources be reduced by expenditures made after the filing of the Medicaid application.

Regardless of whether St. Augustine had problems with its billing system that prevented the timely submission of bills, Lewis was not legally restricted from

using the $48,141 in resources for his support and maintenance when he filed his Medicaid application on May 2, 1997. As a result, Lewis's asset holdings did not fall within the allowable resource limitation on the date of his Medicaid application.

In a nutshell, appellant asks this court to allow the subsequent payment of nursing home expenditures to be applied retroactively for purposes of determining when Lewis became eligible for Medicaid assistance because St. Augustine was not timely in its billing practices. However, Ohio Adm.Code 5101:1–39–05(A) mandates that "[a]ny assets that are resources but not specifically excluded are countable." The $48,141 in resources retained by Lewis after the adjustment to appellant's CSRA were not excludable because they were not encumbered by "a legally binding debt against a specific property" as required by Ohio Adm.Code 5101:1–39–05(A)(7).

The common pleas court did not abuse its discretion by affirming the decision of ODHS to deny Medicaid benefits to Lewis pursuant to his May 2, 1997 application. Notwithstanding Lewis's subsequent potential Medicaid eligibility after paying St. Augustine in early 1998, there was reliable, probative, and substantial evidence to support the denial of eligibility as of the date of the application. Moreover, the decision of ODHS was in accordance with law.

Based on the foregoing analysis, the assignment of error is not well taken. Accordingly, the judgment of the common pleas court is affirmed.

*Judgment affirmed.*

WILLIAM M. O'NEILL, J., concurs.

FORD, P.J., concurs separately.

FORD, Presiding Judge, concurring separately.

I concur entirely with the analysis of the majority with respect to appellant's claim of error that both the trial court and the administrative agencies erred in denying Medicaid benefits to appellant as the statutory law and administrative code regulations are presently structured.

This writer also agrees with the statements in appellee's brief that the legislative intent underlying the adoption by Congress in 1990 of the Medicare Catastrophic Coverage Act, Section 1396r, Title 42, U.S.Code, was, in part, to aid those spouses whose husband and/or wife resided in a nursing home or other medical institution and were receiving Medicaid benefits and one of the main designs of the act was to avoid impoverishing the "community spouse." *Scha-*

*chner v. Perales, as Commr. of the New York State Dept. of Social Serv.* (1995), 85 N.Y.2d 316, 323, 624 N.Y.S.2d 558, 561, 648 N.E.2d 1321, 1324,

Further, this writer again agrees with the appellee's observation that "the Medicaid eligibility rules should not 'facilitate the transfer of accumulated wealth from nursing home patients to their nondependent children.'" *Ford v. Iowa Dept. of Human Serv.* (1993), 500 N.W.2d 26, 28. "Congress designed a program to benefit welfare recipients, not persons seeking to benefit their heirs at the expense of other taxpayers." *Id.* at 31. However, it would appear equitably consistent with the foregoing rationale that "community spouses" should not be penalized as a result of dilatory accounting and billing procedures employed by some nursing home facilities. Thus, this case presents a compelling issue for further legislative review.